2022 IL App (2d) 190468-U
No. 2-19-0468
Order filed May 31, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-603 |
| BYRON T. HOWARD, | ) ) ) | Honorable Sharon L. Prather, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Justices Hutchinson and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's conviction of being an armed habitual criminal had to be reversed where record did not show that he had been convicted of necessary predicate felonies; erroneous admission of jailhouse recording of defendant did not prejudice him; defendant failed to establish that trial counsel was ineffective; and the admission of historic cell tower evidence did not require a *Frye* hearing.

¶ 2                              I. INTRODUCTION

¶ 3   Following a jury trial in the circuit court of McHenry County, defendant, Byron T. Howard, was convicted of first-degree murder, home invasion, armed robbery, armed habitual criminal, and burglary.  He was sentenced to a total of 86 years' imprisonment.  He now appeals, raising four

issues. First, he argues that he was not proven guilty of the offense of armed habitual criminal. Second, he asserts that the trial court erred in admitting a voice recording purportedly of him without an adequate foundation. Third, he contends that trial counsel was ineffective. Fourth, he asserts that the trial court should have held a *Frye* hearing (see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) regarding evidence derived from historic cell phone tower data. For the reasons that follow, we reverse defendant's conviction of armed habitual criminal but otherwise affirm.

¶ 4                                II. BACKGROUND

¶ 5      Defendant's convictions stem from his alleged participation in a home invasion, murder, and armed robbery that occurred at a residence in the city of McHenry on May 27, 2017. Evidence established that on that date, defendant, along with Adam Morris, Charles Campo, and Jared Fox were involved to various degrees. Defendant and Morris entered the house; Campo and Fox remained outside. During the course of the robbery, Donald Jouravleff was shot and killed. After Jouravleff was shot, defendant and Morris demanded money from Donna Mills, the victim's wife, who also lived in the house. She gave them money, and they left. Campo and Fox testified pursuant to a deal they made with the State. At trial, defendant maintained that he had not participated in the home invasion.

¶ 6      The State's first witness was Grant Havens. He stated that he is a 911 dispatcher. In the early morning hours of May 27, 2017, he received a "frantic phone call from a female." It seemed a home invasion was occurring and someone had been shot.

¶ 7      The State next called Donna Mills. In May 2017, she resided at 1804 West Davis Avenue in McHenry. Her husband, David Jouravleff, also lived there. Mills had an office in the basement from which she ran a moving company, A-Best Movers. She kept cash and credit card receipts in the office. In May 2017, the company had two primary drivers, Joseph Ronzio and Roy Daniels.

The drivers hired people to assist them on jobs. When a job was completed, the driver would come to the office and turn in the paperwork and payment. Customers frequently paid in cash. People hired by the drivers to assist them rarely came into the office. Drivers paid their laborers.

¶ 8　　On the morning of Friday May 26, 2017, Mills and Jouravleff had coffee, and he left to go paint Mills's sister's house. Some furniture was delivered to her house that morning. She planned to meet with Daniels that day because he was going out of town. Mills was also going to meet with Daniels's crew, as they would be running the truck while Daniels was gone. Ronzio was also coming in. Daniels arrived, and they met in the basement officer. Also present were Mike Learn, Mike Pierce, and Adam Morris. Morris was going to handle the paperwork and deal with customers while Daniels was away. During this meeting, Mills collected a payment from Daniels of about $3,000 in cash. Morris was present at this time.

¶ 9　　Mills asked if they could help her move a dresser, and Morris and Pierce volunteered to do so. They went upstairs and moved the dresser as well as a mattress. Mills gave them each $30. Jouravleff came home, and they had dinner. Mills's sister came over. After a walk, Mills and Jouravleff went to bed.

¶ 10　　At about 1 a.m., they heard tapping downstairs. Jouravleff jumped up and went downstairs. Mills got up and went to a window. She observed somebody wearing a puffy, dark, shiny jacket "bent down" in the bushes. Mills tapped on the window and yelled to Jouravleff. Immediately, she heard her dog start barking and gunshots. Mills ran to the hall phone and picked it up. She heard someone running up the steps. The person came up behind her, grabbed the phone, and threw it into another room. The person pushed Mills into the next room. He had a gun and told her to be quiet or she would die. He held the gun to her head. The man's voice was "smooth and calm." The man was wearing gloves, but there was a hole where Mills could see that he was black.

He allowed Mills to get on her knees and pray. The man had a green scarf covering his face, and he was dressed in dark clothes. She could see the skin of his neck. He yelled downstairs and asked someone if they had found the money. He then told Mills to go downstairs and show them where the money was. She walked downstairs. In the kitchen area, she noted a white man "[j]umping around, waiving a gun." The white man wore a light-colored mask and dark clothing.

¶ 11    When they got to the basement office, she noted that it was already in disarray. She walked to the desk, opened a door, and gave them her money. Mills got on her knees to pray again and closed her eyes. She then heard the men running up the stairs. The white man said, "This is for Joey ZZ." Mills crawled under the desk and picked up the phone to call 911; however, there was no dial tone. She went to another room in the basement, found a working phone, and called 911. She went upstairs to assist Jouravleff. Subsequently, the police and paramedics arrived. Jouravleff was taken to a hospital, and the police took Mills there. Jouravleff underwent a surgery and was placed in the ICU, where he died.

¶ 12    Mills identified a recording of defendant's voice, that she had previously identified as the man who held her at gunpoint in her house. Prior to the home invasion, Mills had never met Howard, Fox, or Campo.

¶ 13    On cross-examination, Mills stated that after she saw someone crouching in the bushes, she heard gunshots and went to the phone. She did not see what the person in the bushes did after initially observing him. She recalled the people that entered the house were wearing gloves, but she could not describe them. In a separate trial, Morris had been found to be the man she encountered when defendant escorted her downstairs. Though she had seen Morris before, she did not identify him to the police on the night of the crime. She explained that she had not spent as much time with Morris as defendant and that Morris did not speak to her as much as defendant.

Mills was only given the one recording to identify. Mills assumed that the person on the recording was a suspect in the home invasion. She never has identified defendant as one of the men that participated in the home invasion.

¶ 14   Kamil Kuczek, previously of the McHenry Sherriff's Office, next testified for the State. On May 27, 2017, at about 1 a.m., he and Deputy Bengsten were dispatched to 1804 West Davis Avenue in unincorporated McHenry. They approached the front door, which was partially open. Kuczek could hear a woman screaming for help. He entered the house and saw a white male, lying on the floor. Mills was applying pressure to his neck, and there was blood on his neck and her hands. Other officers and emergency medical services arrived. The house was searched to ensure that it was secure.

¶ 15   The State next called William Lynch, who lived in the neighborhood. On May 27, 2017, and about 1 a.m., Lynch was in his home and awake. He heard gunshots, so he looked outside. He heard "some kind of arguing, and then [a] door slammed." Shortly thereafter, he saw "a truck come flying by." The headlights were off, but the right turn signal was activated. It was a dark colored truck and "definitely had a hole in the exhaust" because "[i]t was very loud." Lynch stated that it was a smaller truck, like a "Ford Ranger" and was older.

¶ 16   The State's next witness was Travis Holthausen of the Palatine Fire Department. On May 27, 2017, he was working with the Nunda Fire Department. At approximately 1:04 a.m., he was dispatched to 1804 West Davis Drive in McHenry. They arrived at 1:14 a.m. Holthausen observed a male lying on his right side with a gunshot wound to the leg. A female was kneeling over him applying pressure to a second wound. The male was conscious but unable to speak. They bandaged a wound under the victim's armpit. In all, he noted wounds to the victim's leg, left shoulder, neck and back near the spine. It was unclear whether they were entrance or exit wounds.

He estimated that the victim had one to two liters of blood on the floor around him. They transported the victim to the hospital, arriving at about 1:33 a.m.

¶ 17   Roy Daniels was the State's next witness. On May 2017, he was employed by A-Best Movers as the lead driver. The company was owned by Mills. She operated it out of the basement of her house. Joe Ronzio also worked for A-Best as a driver. Drivers hired their own moving crews. Adam Morris would sometimes work for him or Ronzio on a fill-in basis. On May 25, 2017, he and his crew performed two jobs. On May 26, they performed another job and then went to the office in Mills's basement to plan the following week, as Daniels was going on vacation. Morris, Daniels, and two additional members of the crew (Michael Pierce and Michael Learn) were present. Ronzio arrived later. Daniels gave Mills some paperwork and about $2000 to $3000 in cash. Morris was a few feet away at the time. Morris and Pierce then went upstairs to assist Mills by moving some furniture. Following the meeting, Daniels went home, and later he left on vacation.

¶ 18   Michael Learn then testified that he is a mover. In May 2017, he worked for A-Best Movers and Roy Daniels was his first-line supervisor. During the morning of May 26, 2017, he performed a moving job, finishing up at about 1 p.m. They then went to Mills's house to get paperwork for the next week. Morris gave Learn a ride home. Morris was driving a copper-colored Chevrolet Avalanche (Learn added that it could have been dark gray).

¶ 19   Michael Pierce was the State's next witness. On May 26, 2017, he was working for A-Best movers. They did a small job that morning and went to Mills's office. He and Morris went upstairs and helped Mills by moving a dresser.

¶ 20   The State next called Jared Fox. Fox was currently in jail, but had previously been employed as a concrete worker. He and defendant were neighbors. Defendant lived across the

street from Fox. They would "hang out" together. Charlie Campo was one of Fox's close friends. Fox met Morris through Campo. Morris would come over to Fox's house when Campo did. At the time of defendant's trial, Fox was charged with first-degree murder, home invasion, armed robbery, and burglary. Fox was represented by an attorney, who was present when he testified. Fox was testifying pursuant to a deal with the State, under which in exchange for his truthful testimony, he would receive a sentence of between six- and eight-years' imprisonment for aggravated battery with a firearm, of which he would be required to serve 85 percent.

¶ 21 On Friday, May 26, 2017, Fox worked pouring concrete all day. He finished about 3 p.m. or 4 p.m. and went home. Around 5 p.m., Campo came over. Morris and defendant also came over, and they were "just hanging out in the driveway." They were consuming alcohol. Morris asked Fox to give him a ride to his boss's house, as his boss owed him money. Fox declined, explaining he had worked all day and did not want to drive anywhere. Morris asked four or five times. Eventually, Fox agreed, and the four men left at around midnight or 1 a.m. Morris guided Fox to his boss's house. Fox drove a 1991 Toyota T-100. They parked and crossed a small grass field to get to the house (he added that it may have been someone's side yard).

¶ 22 Morris asked Fox to knock on the door. Fox thought this was strange, but Morris explained that he did not "get along with the lady, and he just wanted to see if anybody was home." Fox knocked. As the door started to open, Fox was "shoved out of the way," and Morris and defendant ran past him. Fox heard gunshots as soon as Morris and defendant entered. Fox did not know they were going to shoot. Fox "took off running." Campo remained across the street in the grass field. Fox and Campo then returned to the truck. They were "freaking out." Morris and defendant returned to the truck about 5 or 10 minutes later. They got in the truck and left. Morris told Fox to "keep [his] fucking mouth shut." They returned to Fox's house. Defendant went home. Campo

and Morris left with their girlfriends. Fox testified that his truck "had a broken exhaust." The "muffler was cracked so it was pretty loud."

¶ 23 On cross-examination, Fox testified that when defendant came over on May 26, 2017, Campo and Harris were already present. Campo's girlfriend, Mariah, was also there. He acknowledged that he had consumed a six-pack of beer that evening, and "[m]aybe a few more." Fox saw that Morris had a gun in his possession earlier that evening. He did not see Howard with a gun. Fox stated that the deal he made with the State allowed him to avoid a likely life sentence.

¶ 24 The State then called Russell Will, a detective with the Crystal Lake Police Department. On June 15, 2017, Will attempted to perform a data extraction from Fox's cell phone. He described how an extraction was performed. A report was generated memorializing the content of the phone. It included phone and email contacts. There were phone contacts with "Bones" and "Bones New" ("Bones" was Morris's nickname).

¶ 25 The State then called Sergeant Andrew Thomas of the McHenry County Sheriff's Office. At 1 a.m., he was dispatched to a shooting at 1804 Davis Drive in McHenry. He arrived at 1:13 a.m. and parked about 100 yards away, so he "could approach more stealthily and on foot." He encountered a man in a yard to his west and conducted a pat-down search. The man stated he lived nearby. Thomas turned the man over to officers from Island Lake. He entered the residence and saw Jouravleff lying on the floor, "bleeding profusely." Paramedics subsequently came and transported Jouravleff to the hospital. Mills was hysterical. She was transported to the hospital by the police as well. They secured the residence. A crime-scene video was made, and Thomas created a scaled crime-scene diagram as well.

¶ 26 The next witness to testify for the State was Sergeant Ben Brock of the McHenry County Sheriff's Office. On May 27, 2017, at about 1:42 a.m., he was dispatched to 1804 Davis Drive in

McHenry. Officers conducted a neighborhood canvas. As a result, Brock spoke to a neighbor, William Lynch. A search warrant was obtained for the crime scene. Brock participated in the search. Prior to the search, the residence was photographed and videotaped. On June 7, 2017, Brock met with Mills and obtained a DNA sample from her. The sample was obtained with Mills's consent. He also took her fingerprints for comparison purposes. On cross-examination, Brock stated he did not know if defendant's fingerprints were ever taken.

¶ 27    The State then called Beatrice Tesoro. She testified that she works for Verizon, where, *inter alia*, she is "a custodian of records." She authenticated a number of cell-phone records and records of activity at cellular towers. The records were admitted into evidence.

¶ 28    Michael Morris next testified for the State. He is a parole agent for the Illinois Department of Corrections. In 2017, Adam Morris was a parolee assigned to his caseload. He identified a record showing Adam Morris's phone calls to the parole department. The document was admitted into evidence. In April 2017, Adam Morris used 224-762-8063 to check in.

¶ 29    Kathy Scarbrough was then called to testify by the State. She stated that Adam Morris is her ex-boyfriend; they dated from June 2016 to November 2018. On May 27, 2017, Scarbrough was living with Bonnie Morris, Adam's mother. Adam has a brother named Steven Morris. Steven is a friend of Campo. Scarbrough testified that she knew Fox, Campo, and defendant. She was aware defendant was living with someone named Jennifer but did not really know her.

¶ 30    Scarbrough said that she owned two guns in May 2017. One was a Springfield nine-millimeter pistol and the other was a "rifle that changed from .22 to a .410 with a barrel." She kept them in the house she shared with Adam and Bonnie. On May 26, 2017, she worked a shift at the post office until 3 p.m. or 4 p.m. She and Adam were going to a meat raffle that evening in Pell Lake, Wisconsin. They left about 6 p.m. (Scarbrough stated she did not recall "exact times"),

made some stops, and then went to the Steel Horse tavern in Pell Lake. They stayed a "few hours," leaving the bar between 10 p.m. and 10:30 p.m. They then went to Fox's house. Fox, defendant, Campo, and Mariah—a woman Campo was seeing despite still being married—were present. Scarbrough was "angry" because she did not want to be around Campo and "wanted nothing to do with Mariah." She and Morris got into a fight because she wanted to leave. People were congregating in the driveway. Morris was standing in the street, and Scarbrough drove off. She returned to Fox's house once, but then left and went home. Later, Morris called Scarbrough, and she picked him up from Fox's house. She estimated that they got home about 1:30 a.m., based on when a television show came on. When she picked him up at Fox's house, nobody else was around. He seemed to be "acting normally."

¶ 31 Shortly after the home invasion, Morris was arrested on a parole violation. He was in jail on May 30 and May 31, 2017. Morris called Scarbrough from jail. In a conversation on May 30, 2017, Morris asked Scarbrough to remove two black garbage bags from the crawl space of their home. She gave them to Steven Morris at his house. She did not look in the bags, but she "believe[d] it was [her] guns." She told Steven to keep the bags away from his girlfriend Deanna.

¶ 32 Scarbrough was interviewed by the police on a number of occasions. She gave the police consent to search her phone. On cross-examination, Scarbrough testified that Fox lived with his girlfriend, Amber. It took 20 or 25 minutes to get from her home to Fox's home. She never gave her pistol to Morris. On redirect-examination, she agreed that phone records indicated that she picked up Morris at 1:30 a.m. on May 27, 2017.

¶ 33 Before proceeding to the next witness, the State sought to introduce certified copies of three of defendant's convictions. Defendant objected, stating that "the law is wrong on this with the State putting these things in front of the jury." The State explained that these convictions were

only pertinent to the charge of armed habitual criminal.

¶ 34    The State then called Charles Campo.  Campo testified that he was currently in custody and charged with a number of offenses, namely, first-degree murder, armed robbery, and home invasion.  He was represented by counsel at the time he testified.  In accordance with an agreement with the State, all charges would be dropped and he would be allowed to plead guilty to aggravated battery with a firearm.  The agreement required him to testify truthfully.  He hoped to receive a sentence of 10 years' imprisonment of which he would serve 85 percent.

¶ 35    Campo stated that he was a friend of Fox and that he knew defendant.  He felt "protective" of Fox.  Morris was also a friend.  Morris's nickname is "Bones."  On May 27, 2017, they were at Fox's house, drinking, smoking, and listening to music.  Eventually, they went for a ride.  They were going to commit a burglary.  Morris told Campo "that there was a lot of money involved, and it would be an easy in-and-out, and that he didn't think anybody was going to be home."  When they got to the house, they parked the truck a short distance away.

¶ 36    When they got to the house, Fox knocked on the door at Morris's urging.  Someone opened the door, and "the screen door was ripped open by [Morris]."  Fox was pushed out of the way.  Morris and defendant rushed in.  Campo heard gunshots, so he and Fox left.  Campo believed they were there to commit a burglary, so he left when he heard gunshots.  He did not know anyone was armed that night.  Campo and Fox returned to the truck.  They met up with Morris and defendant, and the four men left in the truck.  They returned to Fox's house.  Morris gave Campo $300.  Morris was upset that Fox and Campo had run from the house.  Fox and Morris left.  Campo and defendant went to defendant's home.  They burned their clothes in the back of the property.  While doing so, Campo asked defendant what happened.  Defendant said that Morris "was a dog."  They "were trying to figure out why that happened."  They "weren't sure if the money had come from

the house or if [Morris] had it in his pocket previously, and it was a set-up for something."

¶ 37    On cross-examination, Campo stated that he and Morris road motorcycles together. During the burglary, Morris wore a bandana rather than a mask. After the crime, Campo and Fox met to discuss it. They both stripped down so they could see that neither was wearing a wire. Campo acknowledged that he did not know defendant as well as he knew Fox and Morris. He only knew defendant from seeing him at Fox's house. He had never seen defendant with a gun. Campo clarified that after the crime, they went to defendant's house. They did not remain out in the street.

¶ 38    Jennifer Meyer was the State's next witness. When asked how she knew defendant, she replied, "He is my boyfriend." They had been in a relationship for nine years. She knew Campo, Fox, and Morris from the neighborhood. On May 26, 2017, these four people were at Fox's house. They remained outside, talking and drinking. On June 16, 2017, Meyer was interviewed by several police officers. She "believed" the interview was videotaped. She stated that she did "not recall the conversation that [she] had with those officers or the video." She explained that she was "highly medicated and hung over on that interview." She acknowledged that the videorecording showed her making a number of statements about the crime.

¶ 39    On cross-examination, she stated that at the time she was interviewed by the police, she was taking "Norco-10" four times per day for pain. She also was taking Ativan for "extreme anxiety and PTS disorder" and Seroquel, which is an "anti-psychotic [and] also used for schizophrenia and sleep disorder." She was taking these drugs from May 27 through June 17. The police came to her home multiple times, and she felt threatened. On redirect-examination, she added that the police were "extremely mean" to her.

¶ 40    David Mullen next testified for the State. He was called to the crime scene at about 1:30 a.m. on May 27, 2017. He participated in the neighborhood canvas while a warrant was obtained.

On May 30, 2017, he was present for the victim's autopsy. He also participated in a search of the house where defendant and Meyer resided. He collected "numerous items of charred material" from a firepit in the backyard. There were two insoles from Faded Glory brand shoes in the pit. Mullen interviewed Steven Morris at his apartment complex. Steven told Mullen that, at the request of his brother, he placed three garbage bags into a dumpster at the complex. They recovered the garbage bags. Inside, they found a Springfield XDS nine-millimeter handgun, a Taurus .22 caliber rifle, and ammunition for both guns.

¶ 41 On June 12, 2017, Mullen was contacted by Detective Asplund of the McHenry County Sheriff's Office. She asked if he could obtain for her a recording of defendant making a telephone call from the McHenry County jail. All such calls are recorded. Mullen testified that he was familiar with the recording system and had used it "[a] hundred" times. The system has a feature that allows an individual's voice to be isolated. He isolated defendant's voice and sent it to Asplund. He identified a disk that contained the recording he made. Mullen stated that he has listened to the recording, and it is the call made by defendant that he gave to Asplund. Mullen also obtained DNA samples from Morris, Campo, Fox, and defendant.

¶ 42 On cross-examination, Mullen testified that the nine-millimeter pistol recovered from one of the garbage bags was later determined to be the murder weapon. Mullen acknowledged that he only gave Asplund a recording of defendant's voice. He agreed, in hindsight, that the better practice would have been to present Mills with multiple voice samples of other males to choose from.

¶ 43 The State then called Steven Morris. Morris testified that he lives in McHenry with his girlfriend, Deanna. He is a mail carrier. Adam Morris is his brother, and Bonnie Morris is his mother. He knows Kathy Scarbrough. In May 2017, Adam and Scarbrough lived with Bonnie in

McCollum. On June 11, 2017, he received a call from his mother, and Kathy Scarbrough came over to Steven's home. Scarbrough brought him three garbage bags. He did not look inside the bags. He set the bags in his garage. The next day, Scarbrough came by and told him to get rid of them. Steven placed them in a dumpster. A few days later, he showed detectives where he had disposed of the bags.

¶ 44 George Kopulos, a sergeant with the City of Woodstock, then testified that, during the early morning of May 27, 2017, he was notified of a shooting at 1804 West Davis Avenue in McHenry. He then met with the investigation team at the McHenry Police Department. On May 31, 2017, he met with Scarbrough. Scarbrough gave the police permission to search her cellular telephone. He looked at her Google map timeline, which gives GPS coordinates of the phone's location. The phone showed its movements on May 26 and May 27, 2017.

¶ 45 Kopulos met with Adam Morris later that day (May 31, 2017). Adam was in jail, having been taken into custody on an open warrant. Kopulos listened to some calls Adam made to Scarbrough and his mother. Kopulos participated in searches of Steven's house and the house that Scarbrough and Adam lived in. Nothing of evidentiary value was found in either location. Kopulos questioned Steven and placed him under arrest for obstruction. Steven was released when he promised to cooperate. Steven then took the police to the dumpster where he put the garbage bags that contained the guns. They recovered the guns.

¶ 46 On cross-examination, Kopulos agreed that the GPS data on the phone showed the movements of the phone itself. It was an assumption that it was in Scarbrough's possession. If it had been passed to someone else, it would have documented their movements.

¶ 47 The State's next witness was Sergeant Michelle Asplund of the McHenry County Sheriff's Office. At about 1 a.m. on May 27, 2017, she was dispatched to the McHenry hospital

to interview Donna Mills. She arrived at about 2 a.m. She entered the victim's hospital room and noted that he was unconscious and intubated. She was unable to communicate with him. Asplund then met with Mills in the family room. Also present were Mills's sister, a friend, and her two daughters. Mills was "extremely emotional" but cooperative. Asplund performed a number of follow-up interviews with Mills that day.

¶ 48    On June 12, 2017, Asplund met with Mills. She played a recorded snippet of defendant's voice for Mills. Mills then identified the CD she played for Mills. The State sought to have it admitted into evidence, and defendant objected. Defendant stated that the recording was presented as a show-up rather than in a line-up format. Also, defendant pointed out that the original recording had been copied twice before it was presented to Mills. The State responded that the show-up/line-up distinction drawn concerning photographs did not apply to recordings. Further, though the recording had been copied, there was testimony that the copies were "fair and accurate." The trial court found that defendant's contentions were matters of weight and overruled the objection. Asplund then testified that when she played the recording for Mills, Mills's "eyes got wide." Asplund added, "She had tears in her eyes, and she made a statement."

¶ 49    Asplund testified that the police obtained a search warrant for records pertaining to a cell phone tower located near the scene of the homicide. The records were obtained from Verizon. The records showed that at 1:00:19 a.m. on March 27, 2017, a 22-second long call was placed between phones with the numbers 224-762-8063 and 815-403-6887 (the call was initiated by the former number). The number beginning with 815 belonged to Fox. The 224 number was for a prepaid cell phone with no registered user. However, the 224 number was identified in the contacts of Fox's cell phone as belonging to "Bones" (Campo earlier testified that Morris's nickname was "Bones") and there were other associations between Morris and the number.

¶ 50    Notably, records of the activity of the phone of Morris's girlfriend, Kathy Scarbrough, showed considerable traffic between it and the 224 number. Those records also show significant call traffic between Scarbrough's phone and another number associated with Morris. Records derived from Scarbrough's phone show a call from the 224 number at 1:27:27 a.m. on May 27, 2017, that lasted for 17 seconds. Moreover, records of text messages show that Scarbrough referred to the user of the 224 number as "Adam" on numerous occasions. These texts also included statements such as, "I love you." Asplund participated in an interview of Jennifer Meyer at the McHenry police station on June 6, 2017.

¶ 51    On cross-examination, Asplund stated that when she arranged to meet Mills to play the recording for her, Asplund told Mills the purpose of the meeting. She did not tell Mills that the recording was made at the jail. Asplund agreed that Mills was cooperative.

¶ 52    The State then called Ellen Chapman, a forensic scientist employed at the Illinois State Police Forensic Center in Chicago. Chapman analyzed a gunshot residue kit with samples taken from Mills. The samples were positive for gunshot residue. Therefore, Chapman concluded, "the subject either discharged a firearm, contacted a gunshot residue related item, or was in the environment of a discharged firearm." On cross-examination, Chapman agreed that a gunshot residue test could not tell what sort of firearm produced the residue.

¶ 53    The next witness for the State was Phillip Thompson, of the McHenry Sherriff's Department of Corrections. He collected fingerprints from defendant, Morris, Fox, and Campo. The fingerprint cards were admitted into evidence.

¶ 54    Next, Dr. Mark Witeck, a forensic pathologist, was called by the State. Witeck testified that he completed two reports pertaining to Jouravleff's death. He explained that the first report was incomplete, as it did not explain all of the victim's injuries. Accordingly, he requested more

records and generated a second report "to make it more complete."

¶ 55    Witeck acknowledged that all of the victim's injuries had been altered by medical intervention. Debridement—cutting away dead tissue around a wound—makes it "impossible in many cases to tell if it is an entrance or exit" wound. Nevertheless, Witeck opined that the victim died of multiple gunshot wounds.

¶ 56    Blake Aper of the Illinois State Police Rockford Forensic Science Laboratory then testified for the State. He described the process of analyzing a DNA sample. Aper analyzed a blood standard of the victim and fingernail clippings from the victim, which contained DNA that matched. He also analyzed two bullets, but they had no DNA on them. A phone from the crime scene contained DNA for two individuals, but further analysis was inconclusive. Aper analyzed a gun that had a mixture of DNA from at least two people on it. These samples were usable. He compared the samples with standards taken from the victim, Mills, Fox, Campo, defendant, and Morris. He was able to exclude everyone except Morris from having contributed DNA material to a sample from the gun. However, he clarified that about 74 percent of the population also would not be excluded. Aper transferred the gun to the latent fingerprint examiner. On cross-examination, Aper agreed that there were no correlations between defendant and the gun.

¶ 57    Edward Rottman next testified for the State. He is employed at the Illinois State Police Rockford Crime Lab as a forensic scientist. He is the latent fingerprint examiner. He examined a brass shell casing, a paper bag, and three envelopes for latent prints, but was unable to find any. He found prints suitable for comparison on a cash drawer and an envelope; however, he could not identify them. Rottman did find a fingerprint from Morris on a firearm. On cross-examination, he agreed that he found none of defendant's prints on anything.

¶ 58    Julie Steele next testified that she is employed by the Illinois State Police Rockford

Forensic Science Laboratory as a firearms examiner. She test-fired a firearm for Christina Davison, recovered the bullet, and gave the firearm and discharged bullet to Davison.

¶ 59 Davison then testified that she performed "an analysis of firearm evidence as part of the murder investigation of Donald Jouravleff." She examined bullets recovered from the crime scene and compared them with test bullets fired in the laboratory by Steele. She could not determine whether two of the bullets recovered at the crime scene were fired by the firearm—the Springfield XD nine millimeter—she was examining. However, she was able to determine that two other bullets recovered from the crime scene were fired by that gun.

¶ 60 The State's next witness was Ryan Hoven, a deputy with the McHenry County Sheriff's Office. He is a certified crime-scene technician. He accompanied Detective Mullen to the sheriff's office on June 16, 2017, to process evidence, specifically, the contents of three plastic garbage bags. From the bags, *inter alia*, they recovered a Springfield XDS pistol, ammunition, and a .22 caliber rifle. On July 25, 2017, Hoven participated in a search, pursuant to a search warrant, of a truck belonging to Fox. Hoven stated that the truck was "dark blue or black" and was "not in the best condition" as it "had a lot of rust in places."

¶ 61 The State then called Sergeant Andrew Thomas who had previously testified. He is employed by the McHenry County Sheriff's Office. He testified that he has "training and experience in analyzing data from cell phone towers." Thomas described how cell phone towers work. Cell phone carriers keep records regarding towers and cell phone usage. The trial court recognized Thomas as "an expert in cell phone analysis."

¶ 62 Thomas obtained data from Verizon concerning a number of cell phone towers. He found two numbers of interest referenced in the records: 224-762-8063 (the number labeled "Bones" in Fox's contacts) and 815-403-6887 (Fox's number). At 1:00:19 the records show a 21.8 second

call from the 224 number to the 815 number. The call was routed through tower 178, which Thomas plotted on a map. A tower has three antennas, covering 120 degrees. The antenna this call used was on the southeast portion of the tower, centered on 150 degrees. Thomas plotted this arc as well. Further, the records indicated that the "access distance from the tower when the call was made" was 0.3 miles. Thomas added, "It's not an exact distance." Therefore, he plotted the distance as being between 0.2 miles and 0.4 miles. The crime scene is within the plotted area.

¶ 63    On cross-examination, Thomas testified that, though he did not investigate who the 224 number belonged to, he was informed that it belonged to Morris. The 815 number belonged to Fox. Neither number belonged to defendant.

¶ 64    The State then rested. Defendant elected to forgo calling any witnesses. The jury convicted defendant of first-degree murder, home invasion, armed robbery, armed habitual criminal, and burglary. This appeal followed.

¶ 65                                II. ANALYSIS

¶ 66    On appeal, defendant raises four main issues. First, he argues that one of the prior offenses that formed the basis of the armed-habitual-criminal conviction was not a proper predicate offense for that crime. Second, he alleges error in the trial court's decision to allow the admission of an audio recording purporting to be of defendant made in the county jail. Third, he asserts that trial counsel was ineffective for failing to move to sever the counts alleging unlawful possession of a weapon and armed habitual criminal from the remaining counts or, in the alternative, stipulating that defendant's prior convictions satisfied the requirements as elements of these counts. Fourth, defendant contends that the trial counsel was ineffective for failing to request and the trial court erred by failing to hold a *Frye* hearing regarding historic cell site evidence. We find only the first of these arguments persuasive; accordingly, we reverse in part and affirm in part.

¶ 67                              A. ARMED HABITUAL CRIMINAL

¶ 68    Defendant first contends that his conviction of armed habitual criminal (720 ILCS 5/24-1.7 (West 2014)) must be reversed.   Defendant's argument presents an issue of statutory construction, so review is *de novo*.  *People v. Gonzalez*, 388 Ill. App. 3d 1003, 1005 (2009).  At issue here is whether defendant's earlier conviction for aggravated robbery can serve as a predicate conviction for his armed habitual criminal conviction (720 ILCS 5/24-1.7 (West 2014)).  We agree with defendant that it cannot.

¶ 69    The armed-habitual-criminal statute provides as follows:

"(a) A person commits the offense of being an armed habitual criminal if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of any combination of the following offenses:

(1) a forcible felony as defined in Section 2-8 of this Code;

(2) unlawful use of a weapon by a felon; aggravated unlawful use of a weapon; aggravated discharge of a firearm; vehicular hijacking; aggravated vehicular hijacking; aggravated battery of a child as described in Section 12-4.3 or subdivision (b)(1) of Section 12-3.05; intimidation; aggravated intimidation; gunrunning; home invasion; or aggravated battery with a firearm as described in Section 12-4.2 or subdivision (e)(1), (e)(2), (e)(3), or (e)(4) of Section 12-3.05; or

(3) any violation of the Illinois Controlled Substances Act or the Cannabis Control Act that is punishable as a Class 3 felony or higher.

(b) Sentence. Being an armed habitual criminal is a Class X felony."  720 ILCS 5/24-1.7 (West 2014).

It is undisputed that defendant has a prior conviction that qualifies as a predicate offense under

subsection 24-1.7(a)(3) of the Criminal Code of 2012 (Code) (720 ILCS 5/24-1.7 (West 2014)). For the second conviction, the State submitted a certified conviction of defendant's for aggravated robbery.

¶ 70    Aggravated robbery is not mentioned in subsection 24-1.7(a)(2), so it cannot be a predicate offense by virtue of that subsection. Obviously, as it is not a drug-related offense, it does not fit under subsection 24-1.7(a)(3). Subsection 24-1.7(a)(1) allows an offense defined as a "forcible felony" by section 2-8 of the Code (720 ILCS 5/2-8 (West 2014)) to serve as a predicate offense. Although robbery is expressly listed as a forcible felony in section 2-8, aggravated robbery is not. However, section 2-8 also defines a "forcible felony" to include "any other felony which involves the use or threat of physical force or violence against any individual." 720 ILCS 5/2-8 (West 2014). Hence, the only way in which aggravated robbery could serve as a predicate offense for defendant's armed-habitual-criminal conviction is if defendant committed it in a manner that involved the threat or use of force. See *People v. White*, 2015 IL App (1st), ¶ 30 (holding that where an offense is not one of those enumerated in section 2-8 of the Code, "it must fall within section 2-8's residual clause in order to satisfy the forcible felony statute and in turn, the armed habitual criminal statute").

¶ 71    At the time defendant was convicted of aggravated robbery, the aggravated robbery statute read thusly:

"§ 18-5

(a) A person commits aggravated robbery when he or she takes property from the person or presence of another by the use of force or by threatening the imminent use of force while indicating verbally or by his or her actions to the victim that he or she is presently armed with a firearm or other dangerous weapon, including a knife, club, ax, or bludgeon. This

offense shall be applicable even though it is later determined that he or she had no firearm

or other dangerous weapon, including a knife, club, ax, or bludgeon in his or her possession

when he or she committed the robbery.

(a-5) A person commits aggravated robbery when he or she takes property from the person

or presence of another by delivering (by injection, inhalation, ingestion, transfer of

possession, or any other means) to the victim without his or her consent, or by threat or

deception, and for other than medical purposes, any controlled substance." 720 ILCS 5/18-

5 (West 2000).

The certified conviction submitted by the State only indicates that defendant had been convicted

of violating "720-5/18-5." The precise subsection is not identified, and there is no other

information about this earlier offense in the record.

¶ 72    Considering the current version of the statute defining aggravated robbery, the First District

of this appellate court held that "not all forms of aggravated robbery are forcible felonies under

section 2-8." *People v. Bobo*, 2020 Il App (1st) 182628, ¶ 54. Currently, aggravated robbery is

defined as follows:

"(b) Aggravated robbery.

(1) A person commits aggravated robbery when he or she violates subsection (a) while

indicating verbally or by his or her actions to the victim that he or she is presently armed

with a firearm or other dangerous weapon, including a knife, club, ax, or bludgeon. This

offense shall be applicable even though it is later determined that he or she had no firearm

or other dangerous weapon, including a knife, club, ax, or bludgeon, in his or her possession

when he or she committed the robbery.

(2) A person commits aggravated robbery when he or she knowingly takes property from

the person or presence of another by delivering (by injection, inhalation, ingestion, transfer

of possession, or any other means) to the victim without his or her consent, or by threat or

deception, and for other than medical purposes, any controlled substance." 720 ILCS 5/18-

1(b) (West 2020).

The First District explained that the " 'use or threat of physical force or violence against any

individual' is not inherent in subsection (b)(2)'s definition of aggravated robbery." *Bobo*, 2020 Il

App (1st) 182628, ¶ 53. We note that the current section (b)(2) is identical to subsection (a-5) of

the statute under which defendant was convicted. The First District then observed that "[t]he

record is silent on the underlying facts of [the] defendant's aggravated robbery convictions and

thus does not show whether they constituted a forcible felony" and found that the State had not

proven the defendant guilty. Such is the case here.

¶ 73    The State first asserts that since the certified conviction does not specify of which

subsection defendant was convicted, it would be mere speculation to assume that defendant was

convicted under subsection (a-5) rather than subsection (a). Indeed, it would be speculation to

assume that defendant was convicted under either subsection. This, precisely, is the problem for

the State, as it bore the burden of proving every element necessary to sustain defendant's

conviction. *People v. Murray*, 2019 IL 123289, ¶ 28. In the absence of evidence, the burden of

proof is dispositive. *Nelson v County of De Kalb*, 363 Ill. App. 3d 206, 211 (2005).

¶ 74    To escape this uncertainty, the State argues that the offense defined in subsection (a-5) is

an inherently forcible felony. In support, the State asserts that subsection (a-5) contemplates the

use or threat of physical force or violence where it requires "that the perpetrator deliver a controlled

substance into the intended victim's body" in order to "incapacitate or otherwise disable the victim

in order to effectuate the taking of property." While this argument may have some intuitive appeal,

the rule of lenity requires that we interpret any ambiguity in a criminal statute in favor of the defendant. *People v. Gutman*, 2011 IL 110338, ¶ 12. It is unclear whether the legislature intended that the nonconsensual or surreptitious delivery of a controlled substance to constitute a use of force. We note, however, that subsection (a) of the aggravated robbery statute at the time defendant was convicted expressly mentions "force" while subsection (a-5)—the actual subsection under which defendant was convicted—does not. See 720 ILCS 5/18-5 (West 2000). Similarly, in the current version of the statute, the legislature expressly incorporated the definition of simple robbery (which mentions "force") into the definition of aggravated robbery. 720 ILCS 5/18-1(a), (b)(1) (West 2020). Conversely, subsection (b)(2) which defines aggravated robbery in terms of the administration of a controlled substance, does not incorporate the definition of simple robbery or otherwise mention force. *Bobo*, 2020 Il App (1st) 182628, ¶ 51. Hence, it does not appear to us that the legislature intended such administration of a controlled substance to constitute force for the purpose of the aggravated robbery statute. See *Bobo*, 2020 Il App (1st) 182628, ¶ 52 ("In particular, the taking of property by delivering any controlled substance to the victim by deception does not require 'the use or threat of physical force or violence against any individual.' [720 ILCS 5/2-8 (West 2014)].").

¶ 75    The State suggests that the First District has issued conflicting guidance on whether subsection (b)(2) defines an inherently forcible felony. It points to *People v. Lewis*, 2014 IL App (1st) 122126, ¶ 38, where aggravated robbery was considered to be a forcible felony under the residual clause of section 2-8. However, in that case, the defendant did not contend on appeal that aggravated robbery was not a forcible felony by virtue of the residual clause. Moreover, since *Bobo*, as explained above, is more consistent with the overall statutory scheme, we elect to follow it.

¶ 76    Accordingly, we reverse defendant's conviction of being an armed habitual criminal.

¶ 77                           B. THE AUDIO RECORDING

¶ 78    Defendant next argues that the trial court erred by allowing the admission of an audio recording made of him in the McHenry County jail. Defendant asserts that the State failed to lay a proper foundation for the recording's admission. Whether to allow the admission of such evidence is a matter within the discretion of the trial court, and we will only reverse if that discretion is abused. *People v. Taylor*, 2011 IL 110067, ¶ 26. An abuse of discretion occurs only where no reasonable person could agree with the trial court. *People v. Appelt*, 2013 IL App (4th) 120394, ¶ 86. A recording can be authenticated by a participant in the conversation testifying to its authenticity. *People v. Aliwoli*, 238 Ill. App. 3d 602, 623 (1992). However, where, as here, no witness with personal knowledge of the recorded conversation testifies, a proper foundation may be established using the silent-witness theory. See *People v. Dennis*, 2011 IL App (5th) 090346, ¶ 23. This requires the proponent of the recording to present evidence regarding "(1) capability of the device for recording; (2) competency of the operator; (3) proper operation of the device; (4) preservation of the recording with no changes, additions, or deletions; and (5) identification of the speakers." *People v. Smith*, 321 Ill. App. 3d 669, 695 (2001). This is not an exclusive list, and each case must be evaluated on its own facts. *People v. Taylor*, 2011 IL 110067, ¶ 35. The dispositive issue is always "the accuracy and reliability of the process that produced the recording." *Id*.

¶ 79    The State presented evidence that Mills had identified defendant's voice on the recording as the man who had held a gun to her head during the home invasion. The recording was played for Mills by Detective Asplund. Asplund got the recording from Detective Mullen.

¶ 80    Mullen testified that calls made by inmates at the McHenry County jail are recorded.

Mullen stated that he had used the recording system. He determined that defendant had made numerous calls. Mullen had used the system "[a] hundred" times. Mullen explained that one enters a name into the system, and it provides the calls they made in chronological order. He used a program called Enforcer Pro to isolate defendant's voice on a call made on February 19, 2017. Mullen listened to the call and "placed [it] on [a] disk." Mullen testified that the disk contained both defendant's voice and that of another person with whom defendant was speaking. Mullen added that they "couldn't determine how to isolate the voice and actually burn it to a DVD or CD." The disk was a true and accurate copy of the phone call Mullen made by defendant. Mullen sent the recording to Asplund.

¶ 81 Asplund testified that Mullen sent her the recording of defendant's phone call via text message. She played it on her phone and "recorded it on a separate digital recorder." She identified the CD from which she played the call for Mills. Asplund testified that it was a "fair and accurate copy of the recording that [she] played for" Mills. She further stated that nothing had been altered on, added to, or deleted from the recording. After the recording was played for Mills, Asplund testified, Mills's "eyes got wide," and "[s]he had tears in her eyes."

¶ 82 Defendant contends that the State failed to satisfy the first three elements of the silent-witness method of establishing a foundation: "(1) [the] capability of the device for recording; (2) [the] competency of the operator; [and] (3) [the] proper operation of the device" (*Smith*, 321 Ill. App. 3d at 695). Regarding the first factor, defendant points out that the only testimony regarding the capability of the device that recorded the conversation in the jail was that Mullen named the software that it employed and stated that he could look up conversations by an inmate's name, birthdate, and address. As for the second factor, defendant concedes that Mullen did state that he had used the system 100 times; however, he never described any training he received about using

it. Further, defendant asserts, Mullen could not figure out how to isolate defendant's voice, calling his competency into question. Also, there was no testimony regarding who was operating the system at the time it recorded the conversation at issue. Finally, no testimony was presented regarding the third factor—whether the system was operating properly.

¶ 83    Moreover, defendant points out that the recording generated by this initial process was not even the recording that was presented to Mills. There was no evidence presented regarding the capability of the devices used by Asplund to make the recording that Mills ultimately heard, nor was there any testimony about the device (presumably a phone) used by Mullen to transfer the recording to Asplund. There was no testimony as to Asplund's competency to create the recording to which Mills ultimately listened. Further, no evidence was offered to show that any of these devices were functioning properly. Moreover, defendant contends, the fourth factor—the "preservation of the recording with no changes, additions, or deletions" (*Smith*, 321 Ill. App. 3d at 695)—was also not satisfied. In support, defendant points to Mullen's testimony that the recording he made contained both defendant's voice and the voice of the person defendant was speaking with because he could not determine how to isolate defendant's voice; however, the recording presented to Mills contained only defendant's voice. Defendant further points out that Asplund testified that the disk entered into evidence was a fair and accurate recording of what she played for Mills rather than of defendant's phone call from the jail (of which she had no direct knowledge). Finally, defendant asserts that evidence regarding the fifth factor—the "identification of the speakers" (*Smith*, 321 Ill. App. 3d at 695)—was also problematic, for absent evidence that the jail's recording system was operating properly, one cannot know who actually placed the call. Additionally, defendant never testified so the jury could not assess the recording relative to defendant's actual voice.

¶ 84    The State counters that "the recording at issue is reliable." It then recounts the steps Mullen went through to retrieve the recording, and it points to his testimony that he had used the system 100 times. The State further observes that Mullen testified that the recording he made for Asplund had only defendant's voice on it. The State points out that defendant never questioned Mullen about his qualifications to use the recording system. However, the proponent of evidence has the burden of establishing its admissibility. *People v. Kent*, 2020 IL App (2d) 189887, ¶ 94. Hence, the relevance of this assertion is unclear. The State recounts Asplund's testimony in a manner that is largely consistent with how defendant presented it.

¶ 85    Returning to the five-factor test set forth above (see *Smith*, 321 Ill. App. 3d at 695), we conclude that an adequate foundation for the recording had not been laid by the State. Regarding the first factor, there was some testimony from Mullen regarding how one retrieved recordings from the system in the jail; however, there was no testimony as to how one knew it was defendant speaking on the phone at the time (*compare People v. Sangster*, 2014 IL App (1st) 113457, ¶ 27 (recording system required inmate to enter a pin when making a call and had a voice recognition component)). Hence, an important part of how the system functioned was not addressed. Moreover, there was no testimony regarding the other devices used in presenting the recording to Mills. Factor two, the competency of the operator, was arguably satisfied as to Mullen by his testimony that he had used the system 100 times (see *People v. Hanna*, 120 Ill. App. 3d 602, 609 (1983) (holding that "experience alone my qualify one as an expert")), particularly given the deferential standard of review that applies here. However, no evidence was presented regarding Asplund's competence to transfer the recording to a subsequent device. The third factor concerns the proper operation of the devices used to produce the recording. No evidence was presented regarding the proper operation of the jail's recording system *at the time defendant's call was*

*recorded*, nor was any testimony offered regarding the proper operation of any of the other devices. Regarding the fourth factor, the "preservation of the recording with no changes, additions, or deletions" (*id.*), conflicting evidence existed—Mullen testified that he could not isolate defendant's voice, but he also testified that the recording he sent to Asplund contained only defendant's voice. Thus, this factor was arguably satisfied. Fifth, there is no evidence as to how defendant was identified as the speaker on the recording. The State argues that it is enough the jail's recording system recorded calls chronologically and stored them by an inmate's last name; however, this does not explain how one could identify to any degree of probability who the speaker was that was being recorded. In sum, there were significant omissions in the foundation for the recording.

¶ 86    The question of prejudice remains. Defendant contends that Mills's identification of his voice was the only identification she made of him. Moreover, the identification evoked emotion, which, defendant asserts, "may have affected the jury." Defendant continues, "The remaining evidence was not strong." He states that Fox and Campo were not reliable witnesses, as they testified pursuant to deals with the State. Further, Campo acknowledged that he wanted to protect Fox. They met before speaking to the police and "could have aligned their stories." Both minimized their participation in the crime. The State used Mills's identification of defendant's voice to bolster their testimony during closing argument. Defendant also asserts that Meyer was not a reliable witness, as she admitted she takes an antipsychotic medication for schizophrenia. She also stated that she felt "hung over" and that she felt threated by the police when she made her statement to them. Finally, defendant asserts that no ballistic evidence implicated him, and only Morris's fingerprint was found on the firearm used in the offense.

¶ 87    However, this was far from the only evidence implicating defendant. While the deals they

made with the State may have been a basis to question Fox and Campo's credibility, their testimony was also corroborated and consistent. While Meyer's condition at the time she made her statement provides some reason to question her credibility, as the State points out, her knowledge of the crime could have only come from her boyfriend, defendant. Moreover, in addition to Fox, Campo, and Meyer, Scarbrough also testified that Fox, Campo, Morris, and defendant were present at Fox's house on the night of the crime. Mills testified that the man who held her at gunpoint was black. Defendant was the only black person observed with Fox, Campo, and Morris that evening. Campo's testimony that defendant was involved was corroborated in that Campo stated that he and defendant burned their clothes and shoes in defendant's backyard. Mullen testified that he recovered some charred material including the insoles from some shoes from a firepit in the back of defendant's yard. Cell phone records[1] show a call from Morris to Fox at about 1:00 a.m., just after the crime occurred. Morris is compellingly tied to the offense by, *inter alia*, his knowledge of, fingerprint on, and attempts to discard the murder weapon as well as his employment by Mills's company. Morris's attempt to communicate with Fox immediately after the crime corroborates Fox's involvement. It also corroborates Fox's and Campo's testimony that they left the crime scene and returned to the truck when the shooting started, as Morris would not have known where they had gone and would have been looking for his ride back. Lynch (the neighbor) described the truck that came by his house shortly after the crime was consistent with Fox's vehicle in some aspects, provides an additional degree of corroboration. Hence, contrary to

---

[1] At this point, we will not consider locational data in the cell phone records, which is the subject of a later argument advanced by defendant, and simply consider the records to the extent that they show a call was made.

defendant's characterization of the evidence as weak, we find it to be quite compelling.

¶ 88    Generally, the erroneous admission of evidence is harmless if there is no reasonable probability that the outcome of the proceedings would have been different had the error not occurred. *People v. McBride*, 2020 IL App (2d) 170873, ¶ 34.   After considering the totality of the evidence presented, we conclude that the result of the proceeding would not have been different had the recording not been introduced.   In addition to the recording, there was other evidence connecting defendant to the crime.   Notably, Scarbrough and others testified he was with the other offenders on the night of the crime.   Burned shoes and other material was recovered from defendant's backyard, as Campo testified.   Therefore, this argument provides no basis for us to disturb defendant's convictions.

¶ 89                    C. INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 90    In two related arguments, defendant contends that his trial counsel was ineffective. Defendant states that in addition to murder, home invasion, burglary, and armed robbery charges, he was also charged with two weapon-related offenses: unlawful possession of a weapon by a felon (UPW) and being an armed habitual criminal (AHC) (the former merged into the latter at sentencing).   Both weapon-related offenses required the admission of prior felony convictions of defendant.   Defendant contends that his trial attorney was ineffective for failing to move to sever the weapon-related offenses so that the jury considering the other offenses would not be aware of defendant's prior convictions.   Alternatively, defendant argues that trial counsel should have stipulated to the bases of the weapon-related offenses so that the jury would not have heard about their particular nature.

¶ 91    When a defendant alleges trial counsel was ineffective, the familiar standard first articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), applies.   Under this test, the

defendant must show that (1) counsel's performance was objectively unreasonable in light of prevailing professional norms and (2) but-for counsel's unprofessional errors, there is a reasonable likelihood that the outcome of the proceedings would have been different. *People v. Cherry*, 2016 IL 118728, ¶ 24. Regarding the first prong, a defendant must overcome a strong presumption that the course chosen by counsel was the result of trial strategy. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). As for the second prong, a "reasonable probability is one sufficient to undermine confidence in the outcome of the proceedings. *People v. Spann*, 332 Ill. App. 3d 425, 433 (2002). A defendant's failure to satisfy either prong precludes a finding that counsel was ineffective. *People v. Henderson*, 2013 IL 114040, ¶ 11. Thus, a court may dispose of a claim of ineffectiveness by addressing either prong, and, in such cases, it need not address the other prong. *People v. Hale*, 2013 IL 113140, ¶ 17.

¶ 92    The State sought to admit defendant's prior convictions of aggravated robbery, aggravated battery, and a conviction for a violation of the Illinois Controlled Substances Act. Defense counsel interposed the following objection:

> "My objection is standard Judge. I just want to keep my objection of record for
>
> the law, because I think the law is wrong on this with the State putting these
>
> things in front of the jury."

The State responded that the prior convictions were relevant to the weapon-related offenses. The trial court overruled defendant's objection. Defendant points out that during deliberations, the jury sent out a note asking whether defendant's prior convictions of aggravated battery and aggravated robbery involved the use of a firearm. The trial court responded that there was no evidence of that in this case.

¶ 93    Defendant asserts that his counsel's failure to seek a severance was objectively

unreasonable. We note that generally, whether to seek a severance is considered a matter of trial strategy. *People v. Poole*, 2012 IL App (4th) 101017, ¶ 10. Indeed, "A major disadvantage of a severance is that it gives the State two bites at the apple. An evidentiary deficiency in the first case can perhaps be cured in the second." *Id.* Moreover, "trial counsel [may have felt] that it made sense to try for an acquittal of both counts in one proceeding, thinking that the impact of the additional conviction would not be significant." *People v. Gapski*, 283 Ill. App. 3d 937, 943 (1996).

¶ 94    The State points out that the AHC charge carried a sentence of 6 to 30 years' imprisonment. It continues, trial counsel may have considered an all-or-nothing strategy to be the best course, where the identity of the perpetrator believed to be defendant was contested. Deciding on the best course would have required counsel to weigh the risk of prejudice created by the admission of the predicate felonies with the risk of being subject to jeopardy in two proceedings. Defendant suggests that a simultaneous bench trial on the weapon-related offenses could have been held aside the jury trial for the remaining offenses. See *e.g.*, *People v. Cowart*, 2017 IL App (1st) 113085-B, ¶ 1. Simultaneous trials would have still exposed defendant to two separate triers of fact, so choosing this course would require the exercise of judgment as well. Defendant has failed to convince us that counsel's decision not to move for severance was not strategic in nature.

¶ 95    Defendant relies on *People v. Utley*, 2019 IL App (1st) 152112, where, on facts similar to those at issue here, the court determined that trial counsel's failure to move to sever charges on AHC and UPW from other drug-related charges constituted ineffective assistance. However, there is one important distinguishing factor between *Utley* and the instant case. In *Utley*, 2019 IL App (1st), ¶ 48, the court noted that the State had not "identif[ied] any particular 'strategy' that was served by a decision not to move to sever in this particular case." Here, the State has identified a

potential strategy defendant's attorney was employing (not exposing defendant to jeopardy from multiple factfinders). Defendant—while professing to "not seek a ruling that in every case weapons and armed habitual charges must be severed from the remaining charges"—asserts that charges should be severed in appropriate circumstances due to the strong risk of prejudice in the present case. However, defendant does not explain how the circumstances in this case are meaningfully different that in any other case involving AHC or UPW. As such, defendant's attempt to refute the State's argument is not persuasive. The burden of showing that trial counsel's decisions did not amount to trial strategy rests upon defendant. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 80. Defendant has not carried this burden. Further, as we explain in addressing defendant's next argument, defendant has not shown that he was prejudiced.

¶ 96    Defendant's next argument is that trial counsel was ineffective for failing to stipulate to the bases for the AHC and UPW charges. Citing *Old Chief v. United States*, 519 U.S. 172, 174 (1997), defendant notes that jurors should generally not be allowed to hear the name and nature of a defendant's prior convictions unless it is necessary, as such information is unfairly prejudicial. In *People v. Moore*, 2020 IL 124535, ¶ 41, our supreme court recently held that trial counsel's failure to stipulate to the defendant's status as a felon satisfied the first prong of the *Strickland* inquiry. It noted that counsel's failure was not the result of any reasonable trial strategy, observing that the State could articulate no reasonable basis for counsel's failure. *Id*.

¶ 97    The State asserts that counsel did not render ineffective assistance by failing to stipulate for several reasons. First, the State contends that the "prior qualifying convictions have evidentiary significance." The State's point is a bit obtuse; however, we take it to mean that defendant's offer would have been properly rejected by the trial court due to the evidentiary significance of these past convictions beyond establishing defendant's status as a felon. The State does not explain

what *properly* provable thing these convictions would have been relevant to. They could be used to argue defendant is a bad person deserving of punishment; of course, this is not a permissible inference. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). In short, we reject this argument.

¶ 98     The State also points to *People v. Davis*, 405 Ill. 2d 585, 597 (2010), where the court noted that the AHC statute requires not just felony status as a predicate, but convictions for particular felonies. As such, a simple stipulation to felon status would be insufficient. Interestingly, *Davis* found counsel's decision to stipulate to the defendant's prior felonies, including the names of those felonies, not to constitute ineffective assistance. *Id.* It is not apparent how this supports the proposition that counsel in this case was not ineffective for failing to offer a similar stipulation. The *Davis* court explained:

> "We categorically reject defendant's assertion that trial counsel was ineffective for stipulating to defendant's prior convictions, including the name of those convictions, and allowing them to be entered into evidence for the jury's consideration. This court has previously found that *Old Chief* and *Walker* suggest that where a defendant's status as a felon is an element of the offense, a stipulation to his prior felony conviction is the least prejudicial means of introducing the evidence to the trier of fact. *People v. Allen*, 382 Ill. App. 3d 594, 599 (2008). As stated, specific qualifying prior convictions are elements of [AHC,] and defendant ignores that in the absence of a stipulation, the State would have put other evidence before the jury. Although the statute before us requires the State to prove not just the fact of any prior felony conviction, but one of the specifically enumerated prior convictions, we find that in this case, stipulating to those convictions and their names in order to satisfy elements of the offense was inarguably less prejudicial than making the prior convictions an issue in the case." *Id.*

Similarly, here, if defense counsel had offered a stipulation which included the names of the prior felonies as counsel in *Davis* did, it, in the words of the *Davis* court, would have been "inarguably less prejudicial than making the prior convictions an issue in the case." *Id*. Thus, it remains unclear as to what strategy counsel may have been following by not offering such a stipulation, even if the stipulation had to include that name of the felonies to satisfy the AHC statute.

¶ 99 In any event, defendant cannot establish that a reasonable probability exists that the outcome of the trial would have been different had defendant offered such a stipulation. Initially, we note that the jury was properly instructed as to the limited purpose for which it could consider defendant's prior convictions, minimizing the risk of unfair prejudice. See *People v. Charles*, 2018 IL App (1st) 153625, ¶ 33. As explained in the preceding section, the evidence in this case was not close (supra ¶¶ 87-88). Defendant was connected to the crime by both the testimony of witnesses and physical evidence. Defendant did not testify, so his credibility was not at issue. We perceive no reasonable probability that the outcome of the trial would have been different had the jury not learned of defendant's prior convictions. As such, this argument must fail.

¶ 100                                      D. *FRYE*

¶ 101 Defendant's final contention is that the trial court erred by admitting historical cell tower evidence without holding a *Frye* hearing. See *In re Commitment of Sandry*, 367 Ill. App. 3d 949 (2006); see also *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Alternatively, defendant asserts that his trial attorney was ineffective for failing to request such a hearing. We disagree.

¶ 102 Defendant chiefly complains of the testimony of Thomas, whom the trial court recognized as an expert in cell phone data analysis. Thomas testified that he obtained data from Verizon pertaining to a number of cell towers. In those records, he found Fox's phone number and a number associated with Morris. He noted a call between the two numbers at about 1 a.m., shortly

after the crime at issue here. The call was routed through tower 178. Thomas plotted the tower on a map. Cell phone towers have three antennas, and each covers 120 degrees. The antenna this call was routed through was on the southeast side of the tower, which is centered on 150 degrees. Thomas plotted the arc of this antenna. The records also state that the "access distance from the tower when the call was made" was 0.3 miles. Thomas explained, "It's not an exact distance." Accordingly, Thomas plotted the distance as being between 0.2 miles and 0.4 miles. The location where the crime took place is within the plotted area.

¶ 103   Illinois Rule of Evidence 702 (eff. January 1, 2011) codifies the *Frye* standard: "Where an expert witness testifies to an opinion based on a new or novel scientific methodology or principle, the proponent of the opinion has the burden of showing the methodology or scientific principle on which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs." See also *In re Commitment of Simmons*, 213 Ill. 2d 523, 529-30 (2004). We review a trial court's decision regarding application of the *Frye* standard *de novo*. *Id*. at 532. Curiously, the State cites a hearsay case in advocating for the abuse of discretion standard (see *People v. Tenney*, 205 Ill. 2d 411, 436 (2002)); however, *Simmons*, which pertains to *Frye* hearings, clearly applies here. Further, the *de novo* standard also applies to ineffectiveness claims. *People v. Phagen*, 2019 IL App (1st) 153031, ¶ 52.

¶ 104   In this case, the State filed a motion *in limine* seeking the admission of this evidence. In the motion, the State asserted that this evidence was neither new nor novel and it further was not scientific evidence for the purpose of *Frye*. Defendant objected at trial, stating only that defense counsel had been to a seminar and that there were "a lot of problems" with this sort of evidence. In his posttrial motion, defendant further objected, stating that there was no foundation for this testimony and no peer review had been done. The State complains that defendant did not expressly

reference *Frye* and contends that this waives the issue (*People v. Sebby*, 2017 IL 119445, ¶ 48); however, the State did mention *Frye* in its motion *in limine* and defendant was responding to this. Moreover, defendant's mention of a lack of peer review is an obvious reference to *Frye's* general acceptance standard. Defendant states that if we consider the State's motion insufficient to preserve this issue for review, we should address the issue as ineffective assistance on behalf of his counsel for failing to preserve it otherwise. We regard the State's motion and defendant's objections to it sufficient to have preserved the issue.

¶ 105  It is axiomatic that the *Frye* test is applicable only if proffered evidence involves a new or novel scientific principle or methodology. *People v. McKown*, 236 Ill. 2d 278, 282-83 (2010). As a threshold question, therefore, we must determine whether historical cell-tower evidence of the sort at issue here is scientific in nature. The first district of this appellate court addressed this issue in *People v. Fountain*, 2016 IL App (1st) 131474. In that case, the trial court determined that it was not necessary to hold a *Frye* hearing to establish the admissibility of historic cell-tower evidence where it was introduced to establish that the defendant was in the vicinity of the crime scene at the time a robbery and double homicide took place. *Id*. ¶ 56. The court explained that this evidence "was not the product of new or novel scientific principle and methodology." *Id.* ¶ 58. It added, "Reading the coordinates of cell sites from phone records and plotting them on a map is not a scientific procedure or technique, and the *Frye* standard is not applicable." *Id.* (citing *State v. Patton*, 419 S.W.3d 125, 129-30 (Mo. Ct. App 2013)). The *Fountain* court also found that this evidence was not new or novel for the purposes of *Frye* since it "has been widely accepted as reliable by numerous courts throughout the nation." *Id.* ¶ 59 (collecting cases); see also *People v. Powell*, 2015 IL App (5th) 120258-U, ¶ 87. The first district has twice reaffirmed its holding in *Fountain*. See *People v. Wilson*, 2017 IL App (1st) 143183, ¶ 46; *People v. Williams*, 2017 IL

App (1st) 142733, ¶ 40.

¶ 106    We agree with the *Fountain* court.  All Thomas did was transfer data from the cell tower records to a map.  This is not scientific evidence.  Parenthetically, we further agree that this sort of evidence is not new or novel.

¶ 107    Defendant counters that the prosecutor referred to this evidence as scientific at trial. However, defendant cites nothing to substantiate the proposition that such characterizations by attorneys are dispositive.  Defendant also points to the fact that Thomas included a variable in determining how far the phone was from the cell tower when the call at issue was made. Specifically, Thomas stated that the records indicated 0.3 miles, but "[i]t's not an exact distance." Therefore, [t]hrough [his] training and experience, and testing and my understanding in class, its plus or minus 0.1 mile."  We fail to see how the application of a standard variable elevated Thomas's plotting of information on a map to science.  There is no indication that Thomas developed the variable through any application of his knowledge to the facts of this case. *Whiting v. Coultrip*, 324 Ill. App. 3d 161, 166 (2001) ("To qualify as 'scientific knowledge' then, an inference or assertion must be derived by the scientific method.").  Defendant also points to Thomas's testimony that he received extensive training regarding historic cell tower data; however, the mere fact that training is involved does not necessarily elevate a witness's methodology to science.  See *People v. Schuit*, 2016 IL App (1st) 150312, ¶ 84 ("The experience and training of the medical experts in this case is not a scientific principle or theory within the meaning of *Frye*; therefore, *McKown* is inapplicable.").  In short, we find defendant's argument that a *Frye* hearing was necessary in this case unpersuasive.

¶ 108    Moreover, assuming, *arguendo*, that the trial court erred here, we conclude that any error was harmless.  As noted above (supra ¶¶ 87-88), the evidence in this case was strong and

compelling. Notably, even disregarding the cell phone evidence to the extent it pertained to location, it nevertheless corroborated a call between Fox and Morris shortly after the crime. Here, the result of the proceedings would have been the same absent the complained of evidence, so any purported error would have been harmless. *McBride*, 2020 IL App (2d) 170873, ¶ 34.

¶ 109   To conclude, we reject defendant's argument on this issue.

¶ 110                                   IV. CONCLUSION

¶ 111   For the reasons stated, we reverse defendant's conviction for armed habitual criminal but otherwise affirm the judgment of the circuit court of McHenry County.

¶ 112   Reversed in part and affirmed in part.